**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PETER JANKOVSKIS and JONATHAN WHITE, individually and on behalf of all others similarly situated,<br><br>                           Plaintiffs,<br><br>   vs.<br><br>GENERAL MOTORS LLC,<br><br>                        Defendant. | No. 1:17-cv-07822<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     JURISDICTION ...................................................................................................3

III.    VENUE .................................................................................................................4

IV.     PARTIES ..............................................................................................................4

     A.      Plaintiffs ....................................................................................................4

          1.      Peter Jankovskis ............................................................................4

          2.      Jonathan White ..............................................................................6

     B.      Defendant ...................................................................................................7

V.      FACTUAL ALLEGATIONS .................................................................................8

     A.      Track enthusiasts share a passion for racing their vehicles on closed tracks.................8

     B.      Specialized race tracks create safe conditions for track enthusiasts to pursue
          their passion. ..............................................................................................8

     C.      "Track-proven" vehicles operate under extreme conditions and must meet
          certain basic safety features to operate on a race track.................................9

          1.      Transmission systems in "track-proven" vehicles .............................9

          2.      Differentials in "track-proven" vehicles .......................................10

     D.      The Z06 was marketed as if it could operate on race tracks because GM knew
          this was material to potential buyers.............................................................10

          1.      The product information materials promoted track use.................................10

          2.      The features on the Z06 are those one would expect in a track-ready
             car.................................................................................................13

          3.      The Z06 Owner's Manual contemplates track use. .........................14

          4.      Press kits were created by GM to entice track enthusiasts to purchase a
             Z06. ..............................................................................................17

          5.      GM sponsored track events to demonstrate the "track-readiness" of the
             Z06. ..............................................................................................18

     E.      The Z06 cannot be safely raced on the track due to design and manufacturing
          defects in the cooling system. .......................................................................19

      1.     The nature of the defects and their safety consequences ..................................19

      2.     The economic consequences associated with the defects ...............................20

  F.     GM was aware of the defects in the Z06 while marketing them as "track-proven."...................................................................................................................21

      1.     GM concealed the fact that the Z06 was not fit for the track. .........................21

      2.     GM admits that the Z06's cooling system was defective. ...............................22

      3.     GM had knowledge of the defects from consumer complaints. .....................22

  G.    Despite its express warranty, GM has not fixed the problems with the "track-proven" powertrain system..................................................................................27

VI.     CLASS ALLEGATIONS ...........................................................................................29

VII.    CLAIMS FOR RELIEF ............................................................................................32

COUNT ONE VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301 *ET SEQ.*) ...............................................................................................32

COUNT TWO FRAUDULENT CONCEALMENT ...........................................................34

COUNT THREE VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)............................................................................................................37

COUNT FOUR UNJUST ENRICHMENT ........................................................................38

REQUEST FOR RELIEF ....................................................................................................39

DEMAND FOR JURY TRIAL ...........................................................................................40

Plaintiffs Peter Jankovskis and Jonathan White, individually and on behalf of all others similarly situated (the "Class"), allege the following:

## I.     INTRODUCTION

1.     "**Track-Proven Structure and Technologies**." That is what General Motors told potential race-enthusiast customers to entice them to buy its 2015, 2016, and 2017 Corvette Z06. The Z06s were far from ready for the track, however; in fact, they proved to be unreliable there. When a Z06 driver takes their car to the track, he or she learns that after fifteen minutes or less, the Z06 overheats, often causing the car to go into "Limp Mode" at drastically reduced speed and power—an obviously dangerous event when surrounded by speeding cars. The Z06 overheats and goes into Limp Mode because, despite its claims that the Z06 is made for the track, GM chose to equip the Z06 with a defective cooling system. This defect manifests in the "track" car's inability to withstand the demands of race track driving.

2.     There are certain basic rules that all carmakers must follow. When a carmaker sells a car, it has a duty to ensure that the car functions properly and safely for its advertised use and is free from defects. When a carmaker discovers a defect, it must disclose the defect and make it right or cease selling the car. And when a carmaker provides a warranty, it must stand by that warranty. This case arises from GM's breach of these rules. GM deceived its customers when it sold or leased the Z06s while promising that they were built for the track, when in fact they were unreliable and unsafe for that purpose.

3.     GM proclaimed that the Z06 had "track-proven structure and technologies" and explained how the Z06 was "conceived on the track":

010687-11 994884 V1



4.      As GM intended, Plaintiffs and Class members purchased Z06s for road and track use at prices from $80,000 to $120,000. More than 30,000 Z06s have been sold nationwide. But Z06s are not fit for track use due to an ineffective cooling system. This defect results in the powertrain overheating when used on the track, sometimes sending the car into Limp Mode, which is a dangerous condition on a race track full of speeding cars. In addition to manifesting on the race track, the defect also activates the dangerous Limp Mode or overheats in non-track driving conditions.

5.      Customer experiences with the Z06 on the track differ dramatically from GM's promise of a track vehicle and their testimonials chronicle the activation of Limp Mode or the driver having to pull off the track to let the engine cool down. Z06 forums and GM customer service files are replete with complaints from consumers who reasonably believed that their Z06 would in fact be fully track-capable—instead, they have been put at risk of accident on race tracks and during non-track driving when the defective transmissions and rear differentials

- 2 -

overheat, causing the cars to go into Limp Mode at drastically reduced speed and performance or forcing the driver to stop in order to protect the engine.

6. In addition, because the Z06 runs at such high temperatures, and particularly when it overheats, the engine is damaged due to warping from these high temperatures.

7. GM is aware of the defect and suspended production of the Z06 for a period of time to find a solution to the overheating issue, which it intended to incorporate in the 2017 Z06. GM claimed to have fixed the problem in the 2017 model by switching to a new hood with larger vents and a new supercharger cover. However, this fix does not help consumers with previous models and does not fix the problem. The 2017 still overheats and GM's only answer is to, after the fact, warn owners that automatic transmissions have the potential for overheating.

8. But GM cannot shift its warranty obligations onto its customers. If the Z06s need a different cooling system to actually perform as advertised, then GM should retrofit the cars with these components on its 2015 and 2016 models as well as fix the 2017 model to allow the car to perform as promised. Additionally, GM should address and remedy the problems to the engine, transmission, drivetrain, and other parts that occur as a result of these unintended overheating issues.

9. Plaintiffs bring this action individually and on behalf of the Class described below. Plaintiffs seek damages and other equitable relief.

## II. JURISDICTION

10. This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because Plaintiffs are citizens of Illinois and New Jersey and General Motors LLC is a citizen of Delaware (where it is

incorporated) and Michigan (where it has its principal place of business), and the matter in controversy for each plaintiff exceeds the sum of $75,000, exclusive of interest and costs.

### III.    VENUE

11.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions and/or misrepresentations giving rise to Plaintiffs' claims occurred in this District. Plaintiff Jankovskis resides in and took delivery of his Z06 in this District, Plaintiff White's Z06 was bought from and delivered by a dealership in this District, and GM has marketed, advertised, sold, and leased Z06s within this District.

### IV.    PARTIES

**A.    Plaintiffs**

**1.    Peter Jankovskis**

12.    Peter Jankovskis is an individual residing in Lisle, Illinois, and is a citizen of Illinois. On March 25, 2015, Mr. Jankovskis took delivery of a new 2015 Chevrolet Corvette Z06 from Bill Jacobs Chevrolet (now Hawk Chevrolet), an authorized GM dealership in Joliet, Illinois, for approximately $95,265. The vehicle is covered by a manufacturer's warranty. Mr. Jankovskis purchased the vehicle for both road and track use.

13.    Mr. Jankovskis purchased and still owns this vehicle. Unknown to Mr. Jankovskis at the time he purchased the vehicle, the Corvette Z06 suffered from defects, which has caused him out-of-pocket loss associated with the cooling defect, attempted and future attempted repairs, and diminished value of the vehicle. GM knew about these defects but did not disclose the defects to Mr. Jankovskis, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

- 4 -

14.     Mr. Jankovskis selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever produced. Mr. Jankovskis reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read about how various components in all 2015 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a Performance Data Recorder (PDR) and its associated Cosworth data analysis software, and a heads-up tachometer display used for racing. In particular GM highlighted the track capabilities of the Z06 equipped with the AUTOMATIC transmission, posting video of one of their factory race team members (Tommy Milner) driving the automatic version of the Z06 at Road Atlanta. A general claim was made that the Z06 should be able to run through an entire tank of fuel in 85 degree weather. None of the information reviewed by Mr. Jankovskis contained any disclosure relating to any defects in the Corvette Z06 or that the Corvette Z06 was unreliable and unsafe when used on the track.

15.     Mr. Jankovskis's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. Jankovskis that his vehicle's cooling system suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

16.     On June 20, 2015, Mr. Jankovskis' Corvette Z06 overheated and went into limp mode on the track at the Autobahn Country Club after 17 minutes in 73 degree temperatures while shifting the automatic transmission manually (paddle shifting). Mr. Jankovskis returned his Corvette Z06 to his local Chevrolet dealer (Bill Kay in Lisle, Illinois) on June 23, 2015, with a

report of overheating and a note that car had overheated after 17 minutes on track on a 73-degree day. He also provided the dealer with his PDR data and suggested they share it with GM. Following this incident, Mr. Jankovskis upgraded the radiator in his vehicle and applied heat blankets to the catalytic converters and oil lines. Due to GM's failure to disclose the cooling defect, Mr. Jankovskis was denied the benefit of the bargain at the time of sale and paid a premium for a vehicle that he would have not have. Mr. Jankovskis has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**2.  Jonathan White**

17.     Jonathan White is an individual residing in Hackettstown, New Jersey, and is a citizen of New Jersey. In August 2016, Mr. White purchased a used 2015 Chevrolet Corvette Z06 from Auto Showcase of Carol Stream, a luxury vehicle dealership in Carol Stream, Illinois. Mr. White purchased the vehicle over the telephone and had it delivered from the dealership in Carol Stream to New Jersey. The vehicle is covered by a manufacturer's warranty. Mr. White purchased the vehicle for both road and track use.

18.     Mr. White still owns this vehicle. Unknown to Mr. White at the time he bought the vehicle, the Corvette Z06 suffered from defects, which has caused him out-of-pocket loss associated with the cooling defect, attempted and future attempted repairs, and diminished value of the vehicle. GM knew about these defects but did not disclose the defects to Mr. White, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle would be safe and reliable and that the vehicle was intended to be a vehicle that could be used on the track or at high speeds and was capable of safely performing these operations.

19.     Mr. White selected and ultimately purchased his vehicle, in part, because the Corvette Z06 was represented to be "track-proven" and "the most capable track-Corvette" ever

produced. Mr. White reviewed print and online advertisements showing photographs of the Corvette Z06 on race tracks and read about how various components in all 2016 Corvette Z06s were "track-proven," such as the suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. None of the information reviewed by Mr. White contained any disclosure relating to any defects in the Corvette Z06 or that the Corvette Z06 was unreliable and unsafe when used on the track.

20.     Mr. White's vehicle was equipped with items a reasonable consumer would believe to be present in a vehicle to be used on a track, including special suspension, special steering, special brakes, and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. If GM had disclosed to Mr. White that his vehicle transmission suffered from defects that would prevent the full use of his vehicle and pose safety risks, then he would not have purchased the vehicle or he would have paid less for it.

21.     Mr. White planned to use his 2015 Corvette Z06 on the road and on the track but stopped taking it to the track after his vehicle overheated and went into limp mode on the track during his first visit to the track. Due to GM's failure to disclose the cooling defect, Mr. White was denied the benefit of the bargain at the time of sale and paid a premium for a vehicle that he would have not have. Mr. White has also suffered additional damage relating to the cost of repair needed to make the vehicle operate as a reasonable consumer would have expected.

**B.     Defendant**

22.     General Motors LLC is a corporation doing business in all 50 states and the District of Columbia, and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. At all times relevant to this action, GM manufactured, sold, leased, and warranted the Z06s at issue throughout the United States. GM and/or its agents designed, manufactured, and installed the defective cooling systems in the Z06s. GM also

developed and disseminated the owner's manuals, supplements, and warranty booklets, advertisements, and other promotional materials relating to the Z06s, and provided these to GM's authorized dealers for the express purpose of having these dealers pass such materials to potential purchasers. GM also created, designed, and disseminated information about the track capabilities of the Z06 to various agents of various publications for the express purpose of having that information reach potential consumers.

## V.     FACTUAL ALLEGATIONS

**A.     Track enthusiasts share a passion for racing their vehicles on closed tracks.**

23.     There is a segment of car purchasers who buy cars that are designed to be used, in part, on race tracks. Often called "track enthusiasts," these car purchasers are passionate about motorsports and relish a challenging driving experience. Track enthusiasts often purchase their enthusiast vehicle so that they can drive on public roads as well as specialized race tracks. The Z06 has been heavily advertised as track-capable and GM aggressively markets the Z06 to track enthusiasts.

**B.     Specialized race tracks create safe conditions for track enthusiasts to pursue their passion.**

24.     Track enthusiasts purchase race cars to drive on closed race tracks. There are dozens of race tracks across the United States where track enthusiasts are allowed to bring their Z06 and operate them at very high speeds on closed tracks that are sealed off from all other highways and roads. A track enthusiast purchases time at a track—usually in thirty-minute increments—and drives on the track with other cars also racing at the same time. Typically, these race tracks provide a safe and welcoming environment for participants to explore the capabilities and limits of their high-performance sports cars while improving their driving skills. Race tracks can also provide instruction and coaching for drivers of all skill levels. The main priority for both

010687-11 994884 V1

track enthusiasts and race track operators is always safety—both for track drivers and others who may be physically located near the race track. As such, speed and distance are closely monitored and specialized etiquette mores—or rules of the road—must be adhered to at all times.

**C.    "Track-proven" vehicles operate under extreme conditions and must meet certain basic safety features to operate on a race track.**

25.    "Track-proven" Z06s routinely reach speeds in excess of 125 mph on specialized race tracks and operate under conditions that place an extreme amount of stress on Z06 systems. To keep track drivers and others safe, "track-proven" Z06s are not equipped in the same way as typical consumer Z06s. Two important differences relate to the transmission system and rear differentials in "track-proven" Z06s.

**1.    Transmission systems in "track-proven" vehicles**

26.    In the context of motor Z06s, a transmission system takes the power generated by the Z06's engine and applies that power to calibrate the speed and torque of the wheels. This process is accomplished by the driver shifting through different gears. Slower, or lower, gears are used to slow down the output speed of the engine and increase torque. Higher gears increase the output speed and decrease torque. Further, race track conditions often require drivers to change gears extremely quickly—usually in a tiny fraction of a second. As such, the transmission system for "track-proven" Z06s must come equipped with certain features, such as transmission coolers, to cope with the high engine speeds and fast, frequent gear shifts consistent with the rigors of track use. Without these features, the transmission systems in Z06s, for example, will overheat, causing the vehicle to go into Limp Mode. As explained in more detail below, Limp Mode refers to a scenario where, to prevent damage, a Z06 automatically regresses to a lower RPM (revolutions per minute) with a drastically slower speed, much to the surprise of the individual driver and those driving nearby.

### 2. Differentials in "track-proven" vehicles

27.     A rear differential is a component in all cars and is designed to compensate for the difference in distance the inner wheels and outer wheels travel as the car goes around a corner. For track drivers—who routinely turn corners while pressing on the gas in a powerful car—poor rear differentials can cause the inside wheel to start to over-spin, leading to less grip and traction. The driver then loses the ability to properly maneuver the outside wheel and can potentially lose control of the Z06. This can result in erratic driving and an increased risk for collisions.

28.     Owners of "track-proven" Z06s therefore must ensure that their rear differentials remain fully operational by allowing for the application of a specialized cooler.

### D. The Z06 was marketed as if it could operate on race tracks because GM knew this was material to potential buyers.

### 1. The product information materials promoted track use.

29.     From its introduction, GM described the Z06 as fit for the track due to its superior performance technology, as explained in this 2015 vehicle information kit:

Vehicle Highlights

- All-new model enters **supercar territory with race-proven design**, advanced technologies and world-class performance

- With **track-focused Z07 performance package**, 2015 Corvette Z06 delivers faster lap times than 2014 Corvette ZR1

- First Corvette Z06 to offer supercharged engine, paddle-shift automatic transmission and removable roof panel for coupes, and convertible model

- New LT4 supercharged 6.2L V-8 SAE-certified at 659 hp (485 kW) and 881 Nm of torque

**2015 CORVETTE Z06 IS THE MOST
CAPABLE CORVETTE EVER**

The Z06 rejoins the Corvette lineup for 2015 as the most capable model in the iconic car's 62-year history. It stretches the performance envelope for Corvette with unprecedented levels of aerodynamic downforce – and it **is the first Corvette Z06 to offer a supercharged engine**, an eight-speed paddle-shift automatic transmission and, thanks to a stronger aluminum frame, a removable roof panel.

The new LT4 supercharged 6.2L V-8 engine is SAE-certified at 650 horsepower (485 kW) at 6,400 rpm and 650 lb-ft of torque (881 Nm) at 3,600 rpm – making the 2015 Corvette Z06 the most powerful production car ever from General Motors and one of the most powerful production cars available in the United States. With the available Z07 package, its capability enables:

- 0-60 mph acceleration in 2.95 seconds with the eight-speed automatic and 3.2 seconds with the seven-speed manual transmission
- Quarter-mile times of 10.95 seconds at 127 mph with the eight-speed and 11.2 seconds at 127 mph with the seven-speed transmission a
- Lateral acceleration of 1.2 g
- 60-0 mph braking in only 99.6 feet – the best of any production car tested by General Motors.

30.     GM's 2015 product information brochure proclaimed that it borrowed from its

Racing Corvette to make the Z06 track ready:

The Corvette Z06 is a great example of the technology transfer between racing and production Corvettes," said Juechter. "First, we took what we learned on the Corvette Racing C6.R and applied that to the all-new Corvette Stingray. Then, using the Stingray as a foundation, the Z06 and C7.R were developed to **push the envelope of performance on the street and the track**.

31.     In the brochure, GM also proclaimed that it met performance targets by adding

features to address cooling issues:

Practically every exterior change served a functional purpose, as this beast needed more of everything," said Tom Peters, Corvette design director. "The flared fenders accommodate larger, wider wheels and tires for more grip. **The larger vents provide more cooling air to the engine, brakes, transmission and differential for increased track capability**. The more aggressive aerodynamic

package generates true downforce for more cornering grip and
high-speed stability.

32.     A high-performance engine running on a track produces high temperatures that

must be dealt with. GM assured consumers in its 2015 brochure that the Z06 could handle high

temperatures:

> **The exterior design also reflects the increased cooling required
> for the new Corvette Z06. For example, the mesh pattern on
> the front fascia was painstakingly designed to deliver the most
> possible airflow to the supercharger's intercooler heat
> exchanger**, so much so that the mesh grill directs more air into the
> engine bay than if the grille was removed.
>
> **Additional cooling elements include larger front fender vents
> and unique air blades over the inlets on the rear fenders of
> Coupe models, which force about 50 percent more air into the
> cooling ducts for the transmission and differential coolers than
> those on the Stingray**. Convertible models feature under-body
> inlets. To cope with the additional airflow, Z06 Coupe and
> Convertible also have larger rear-fascia openings than the Stingray.
>
> **Standard front and rear brake-cooling ducts, including Z06-
> signature rear ducts integrated in front of the rear fender
> openings, are also part of the functional design changes over
> Stingray models**.

33.     To appeal to track enthusiasts, GM, in its 2015 brochure and in other promotional

material claiming the Z06 was track proven, stated:

> **Track-proven structure and technologies**
>
> The 2015 Corvette Z06 leverages the technologies introduced on
> the Corvette Stingray, including the strategic use of lightweight
> materials and advanced driver technologies, with unique features
> and calibrations tailored for its capabilities.
>
> "Our mission with the seventh-generation Corvette was to make
> the performance levels more accessible, enabling drivers to exploit
> every pound-foot of torque, every "g" of grip and every pound of
> downforce," said Juechter. "It's a philosophy we introduced with
> the 460-horsepower Corvette Stingray – and one that's even more
> relevant with 650 horsepower at your beck and call."

The new Z06 retains the SLA-type front and rear suspension design of the Corvette Stingray but is uniquely calibrated for the higher performance threshold. The third-generation Magnetic Selective Ride Control dampers are standard on Z06. **They can be adjusted for touring comfort or maximum track performance via the standard Driver Mode Selector**.

**2.  The features on the Z06 are those one would expect in a track-ready car.**

34.  GM sold the 2015 Z06 with three trim levels: Standard, Areo Package, and Z07 Package. The difference in trims were as follows:

- The standard Z06 features a front splitter, spats around the front wheel openings, a unique carbon-fiber hood with a larger vent, and a rear spoiler.

- An available carbon-fiber aero package – in either black or a visible carbon-fiber finish – adds a carbon fiber front splitter with aviation-style winglets, carbon fiber rocker panels, and a larger rear spoiler with a fixed wickerbill, which combine to create true aerodynamic downforce.

- The available Z07 package add larger winglets to the front splitter, along with an adjustable, see-through center section on the rear spoiler for track use. With this package, the Corvette Z06 delivers the most aerodynamic downforce of any production car GM has tested.

35.  Additionally, the Z06s were equipped with dozens of features that would suggest to a reasonable person that the vehicles were built with the intention of occasional track use. Some of these features included the following: an LT4 supercharged 6.2L V-8 engine with 650 horsepower at 6,400 rpm and 650 16-ft of torque at 3,600 rpm, making the Z06 "one of the most powerful production cars ever from General Motors"; special tires to deliver the "grip needed for the Z06's performance targets"; special steering and performance brakes; and specific software settings, including a "Track App" and a heads-up tachometer display used for racing. Even the leather seats were outlined with fabric to mitigate against passengers slipping and sliding in their seats while taking corners at high speeds.

- 13 -

### 3. The Z06 Owner's Manual contemplates track use.

36. Track use is contemplated in the Owner's Manual. For example, the 2015 Z06

Owner's Manual contemplates track use:

**Track Events and Competitive Driving**

Participating in track events or other competitive driving without following the instructions provided may affect the vehicle warranty. See the warranty manual before using the vehicle for racing or other competitive driving.

**Launch Control**

Available only in Track mode for maximum "off-the-line" acceleration when in Competitive or PTM modes.

**Competitive Driving Mode**

If equipped, Competitive Driving Mode, Performance Traction Management, and Launch Control are systems designed to allow increased performance while accelerating and/or cornering. This is accomplished by regulating and optimizing the engine, brakes, and suspension performance. These modes are for use at a closed course race track and are not intended for use on public roads. They will not compensate for driver inexperience or lack of familiarity with the race track. Drivers who prefer to allow the system to have more control of the engine, brake, and suspension are advised to turn the normal traction control and StabiliTrak systems on.

37. The 2016 Z06 Owner's Manual had additional provisions regarding track use:

**Racing/Track Brake Burnishing Procedure (Z06 with Z07 Performance Package or Z06 with J57 Ceramic Brakes)**

This procedure should only be run on a track and only on dry pavement.

| Caution |
| --- |
| Brake pedal fade will occur during this track burnish procedure and can cause brake pedal travel and force to increase. This could extend stopping distance until the brakes are fully burnished. |

1. Drive a normal first lap, not too aggressively.
2. Laps 2 and 3 should be gradually driven faster and more aggressively, while allowing for reduced brake output and increased stopping distance due to brake fade.
3. Drive Lap 4 near full speed, while allowing for reduced brake output and increased stopping distance due to brake fade.
4. Laps 5 and 6 should be cool down laps.
5. Lap 7 should be normal driving or an easy out lap.

**Z07 Performance Package**

The Z07 Performance Package has an installed Stage 2 Aero Package, which consists of a front splitter with short end caps, rocker panel extensions, and a rear spoiler.

Stage 3 Aero components are delivered but not installed on the vehicle. These are intended to be installed for track use only. The components include:

- Front splitter tall end caps that replace the front splitter short end caps.
- A center transparent wicker bill for the rear spoiler.

| ⚠ Warning |
| --- |
| Changing the following track settings could reduce tire traction and could cause a crash. Do not change the track settings. |

The track settings for the Z07 Performance Package with the Stage 3 Aero Package are:

- The front splitter tall end caps installed.
- The center transparent wicker bill installed all the way up on the rear spoiler.
- The Driver Mode Selector in Track Mode.

**Stingray with Performance Package-Carbon Fiber (CFZ)**

The Stingray with Performance Package-Carbon Fiber (CFZ) has an installed aero package which consists of a front splitter with short end caps, rocker panel extensions, and a rear spoiler. A center transparent wicker bill for the rear

**Competitive Driving Mode**

If equipped, Competitive Driving Mode, Performance Traction Management, and Launch Control are systems designed to allow increased performance while accelerating and/or cornering. This is accomplished by regulating and optimizing the engine, brakes, and suspension performance. These modes are for use at a closed course race track and are not intended for use on public roads. They will not compensate for driver inexperience or lack of familiarity with the race track. Drivers who prefer to allow the system to have more control of the engine, brake, and suspension are advised to turn the normal traction control and StabiliTrak systems on.

| Caution |
| --- |
| Attempting to shift when the drive wheels are spinning and do not have traction may cause damage to the transmission. Damage<br>(Continued) |

| Caution (Continued) |
| --- |
| caused by misuse of the vehicle is not covered by the vehicle warranty. Do not attempt to shift when the drive wheels do not have traction. |

**Competitive Driving Mode (Except Z51 and Z06 with Magnetic Ride Control)**

Competitive Driving Mode allows full engine power while StabiliTrak helps maintain directional control of the vehicle by selective brake application. In this mode, TCS is off and Launch Control is available. Adjust your driving style to account for the available engine power. See "Launch Control" later in this section.



## Performance Traction Management (Z51 and Z06 with Magnetic Ride Control)

Performance Traction Management (PTM) integrates the Traction Control, StabiliTrak, and Magnetic Ride Control systems to provide improved and consistent performance when cornering. The amount of available engine power is based on the mode selected, track conditions, driver skill, and the radius of each corner.



This light is on when the vehicle is in the PTM mode.

To select this optional handling mode, the vehicle mode must be Track. Then quickly press the TCS/StabiliTrak button on the center console two times. PERF TRAC 1 - WET ACTIVE HANDLING ON displays in the DIC.

To experience the performance benefit of this system, after entering a curve and at the point where normal acceleration occurs, fully push the accelerator pedal. The PTM system will modify the level of engine power for a smooth and consistent corner exit.



The PTM system contains five modes. These modes are selected by turning the Selective Ride Control/Performance Traction Management MODE SELECT knob on the center console. Scroll up or down through modes 1–5 by turning the MODE SELECT knob to the right or left.

The following is a DIC display description and the recommended usage of each mode:

### PERF TRAC 1 – WET ACTIVE HANDLING ON

- Intended for all driver skill levels.
- Wet or damp conditions only — not intended for use in heavy rain or standing water.
- StabiliTrak is on and engine power is reduced based on conditions.

### PERF TRAC 2 – DRY ACTIVE HANDLING ON

- For use by less experienced drivers or while learning a new track.
- Dry conditions only.
- StabiliTrak is on and engine power is slightly reduced.

### PERF TRAC 3 – SPORT ACTIVE HANDLING ON

- For use by drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than mode 2.
- StabiliTrak is on and more engine power is available than in mode 2.

### PERF TRAC 4 – SPORT ACTIVE HANDLING OFF

- For use by drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than modes 2 or 3.
- StabiliTrak is off and available engine power is the same as mode 3.

- 16 -

**PERF TRAC 5 – RACE ACTIVE HANDLING OFF**

- For use by experienced drivers who are familiar with the track.
- Dry conditions only.
- Requires more driving skill than in other modes.
- StabiliTrak is off and engine power is available for maximum cornering speed.

Press and release the TCS/StabiliTrak ⚠ button to turn off PTM and return to the traction control and StabiliTrak systems. The traction off light 🔄 and StabiliTrak OFF light ⚠ will go out.

**Launch Control (Track Mode Only)**

A Launch Control feature is available, within Competitive Driving Mode (except Z51 and Z06 with Magnetic Ride Control) or Performance Traction Management (Z51 and Z06 with Magnetic Ride Control), on all vehicles to allow the driver to achieve high levels of vehicle acceleration in a straight line. Launch Control is a form of traction control that manages tire spin while launching the vehicle. This feature is intended for use during closed course race events where consistent zero to 60 and quarter mile times are desirable.

Launch Control is only available when the following criteria are met:

- Competitive Driving Mode is selected (except Z51 and Z06 with Magnetic Ride Control) or any of the Performance Traction Management modes are selected (Z51 and Z06 with Magnetic Ride Control). The TCS light comes on the instrument panel and the appropriate DIC message displays.
- The vehicle is not moving.
- The steering wheel is pointing straight.

**4.       Press kits were created by GM to entice track enthusiasts to purchase a Z06.**

38.       GM also made available online, and in other forums, different press kits outlining the unique features of the Z06. These kits provided a substantial amount of detail on the Z06 as well as several specific misrepresentations that the Z06s were designed to be used on a race track. For example, the 2016 product information kit proclaimed that the Z06 was "track-proven," as had been the claim in the 2015 product kit:

> **Track-proven structure and technologies**
>
> The Corvette Z06 leverages the technologies introduced on the Corvette Stingray, including the strategic use of lightweight materials and advanced driver technologies, with unique features and calibrations tailored for its capabilities.

- 17 -

Its aluminum frame is produced in-house at General Motors'
Bowling Green assembly plant. It's the same robust, lightweight
frame used on the Corvette Stingray and it is used essentially
unchanged for the C7.R race cars.

39.     The kit described features that were designed for use on the track:



The stiffer design of the aluminum frame allows the Corvette Z06 to be offered with
a removable roof panel for the first time. With the lightweight, carbon fiber roof
panel removed, the new Corvette Z06 offers 20 percent more structural rigidity
than the previous model's fixed-roof design. It is 60 percent stiffer than the
previous model with the roof panel installed.

The new Z06 retains the SLA-type front and rear suspension design of the Corvette
Stingray but is uniquely calibrated for the higher performance threshold. The third-
generation Magnetic Selective Ride Control dampers are standard on Z06. They can
be adjusted for touring comfort or maximum track performance via the standard
Driver Mode Selector.

Like the Stingray, the Driver Mode Selector tailors up to a dozen features of the
Z06 to suit the driver's environment, including:
- **Launch control:** Available in Track mode for manual and automatic
  transmissions, providing maximum off-the-line acceleration
- **Active handling (StabiliTrak electronic stability control):** A
  "competitive" setting is available in Track mode and is more suited for on-
  track conditions. It can also be disabled, giving the driver complete control
- **Traction control:** Weather mode tailors traction control and engine torque
  for driving in inclement conditions
- **Performance Traction Management:** Available in Track mode and offers
  five settings of torque reduction and brake intervention for track driving
- **Electronic Limited Slip Differential:** Adjusts the rate at which the limited
  slip engages to balance between steering response and stability in different
  driving conditions with more aggressive performance in Sport and Track
  modes.

The smart electronic limited-slip differential, or eLSD, is standard on the Z06 to
make the most of the torque split between the rear wheels. The system features a
hydraulically actuated clutch that can infinitely vary clutch engagement and can
respond from open to full engagement in tenths of a second. It shifts torque based
on a unique algorithm that factors in vehicle speed, steering input and throttle
position to improve steering feel, handling balance and traction.

**5.      GM sponsored track events to demonstrate the "track-readiness" of the Z06.**

40.     GM also sponsored several track events where the Z06 was prominently featured

and marketed to track enthusiasts and promoted "Corvette Owner's Schools" where Corvette

owners were encouraged to develop their track skills.

E.     **The Z06 cannot be safely raced on the track due to design and manufacturing defects in the cooling system.**

1.     **The nature of the defects and their safety consequences**

41.     The performance of a car on the track is a material factor in the decision to purchase a Z06.

42.     However, Z06s cannot be effectively and safely used on the track due to a defective cooling system. As a result, the engine will overheat if it operates on the track during a typical track session, which causes the Z06 to go into Limp Mode to prevent permanent damage, or causes the driver to see the overheat gauge and pit the car before it goes into Limp Mode. Typically, Z06s in Limp Mode can immediately go from well over 100 mph to a substantially lower speed and lose power. As a result, the driver can become disoriented and lose control of the Z06, increasing the risk of an accident. This scenario is also extremely dangerous for other drivers operating at high speeds nearby who do not expect the car racing in front of them to essentially freeze on the track, thereby putting them at risk for accidents as well.

43.     The Z06s also contain a manufacturing defect in that unexpected overheating of a powertrain system can damage other essential operations of the vehicle, including the engine, clutch, rear end, and other parts. Coolers are required not only for Z06s that will be used on a race track but for all non-racing Z06s as well, because coolers are required for the purpose of preventing premature failure of the engine, drivetrain, transmission, rear differential, and other parts due to routine high temperatures not experienced in cars with coolers. Thus, track enthusiasts are faced with an impossible choice: (1) allow for overheating events to occur at unexpected times, thereby causing increased safety risks as well as damage to the engine, transmission, drivetrain, differential, and other parts of the Z06; or (2) take a gamble by modifying their car with aftermarket repairs that were not initially envisioned by GM engineers

- 19 -

and cross their fingers that such modifications will not affect the performance or long-term reliability of their Z06, let alone the future enforcement of their express warranties. Under either of these scenarios, track enthusiasts are not getting what they bargained for.

44.     Frighteningly, the same Limp Mode can also unexpectedly occur on the road during non-track conditions. If Limp Mode occurs on a public highway, for example, it presents a completely distinct safety issue due to material differences in speed and the skill set of drivers on public roadways as compared to drivers on closed race tracks. Nevertheless, one thing is clear: even with the inherent differences of highway driving, a Z06 rapidly decelerating on a highway is dangerous and can result in a high-speed collision. This defect is unacceptable for customers who own a Z06.

45.     The presence of Limp Mode on public roadways is not some esoteric, distant safety issue. Not only have some plaintiffs herein alleged that they have experienced Limp Mode while on public roadways, but established publications have also reported the manifestation.

### 2.     The economic consequences associated with the defects

46.     In addition to the increased safety risks associated with the defects contained in the Z06s, Plaintiffs have also suffered economic harm as a result of GM's fraudulent conduct. First, Plaintiffs estimate that a repair to adequately correct the defects in the Z06 to make them "track-proven" would cost in excess of $20,000, including parts and labor to resolve the transmission issue only. Plaintiffs and Class members are required to pay this amount out-of-pocket as the addition of a proper cooling system is not covered under any of GM's warranties. Second, Plaintiffs and other Class members who choose not to make these aftermarket repairs lose the ability to operate their "track-proven" Z06s on a race track and risk permanent damage to the engine, transmission, drivetrain, rear differentials, and other parts. Third, the repairs

suggested by GM may constitute aftermarket modifications that risk violating enforcement of the express warranties of the Z06s. Thus, they have not received that for which they have bargained.

47.     Plaintiffs have also suffered a diminution of value due to the fact that prospective owners are now aware that if they want to actually drive safely—and conform to the rules and safety habits mandated by virtually all race track organizations—they would need to pay thousands of dollars to get the same mandatory safety features that are now standard on 2017 Z06s. This additional repair, or the inability to use this "track-proven" Z06 on a race track, will factor into the purchase price and decision of prospective buyers. Moreover, the constant overheating leads to warping of the metal parts of the engine, transmission, drivetrain, and other parts. As a result, owners of the Z06s will receive less for their vehicles on the secondary market.

48.     Plaintiffs have also paid considerable sums of money above that of the MSRP for a Z06. These premiums ranged from $1,000 to more than $20,000 on top of the list price and represents further economic loss experienced by Plaintiffs.

**F.      GM was aware of the defects in the Z06 while marketing them as "track-proven."**

**1.      GM concealed the fact that the Z06 was not fit for the track.**

49.     In the first half of 2015, GM continued to make repeated false statements that Z06s were "track-proven" and "the most track-capable car" ever produced while knowing that they were unfit and unsafe for track use. Further, it is not possible that GM suddenly learned of this defect as manufacturers spend a year or more testing new models. GM had been testing Z06s on the track prior to introduction to the market and had to have discovered this defect. GM refused to disclose the defects to the public and the fact that Z06s were unfit and unsafe for race track use during this time, or that the Z06s would enter the dangerous Limp Mode if taken onto a race track and operated at high speeds.

010687-11 994884 V1

### 2. GM admits that the Z06's cooling system was defective.

50. GM admitted that its Z06 had a cooling defect when it halted production in 2016 to find a solution to the overheating issue. GM admitted that it was responding to complaints of overheating and that its solution for the 2017 model was to switch to a new hood with larger vents and a new supercharger cover.

51. The alleged "fix" does not help consumers with 2015 or 2016 Z06s. A third party, Hennessey, offers a fix in the form of a High-Flow Heat Exchanger with a Cold Induction System but at a cost of $20,000.

### 3. GM had knowledge of the defects from consumer complaints.

52. Manufacturers like GM have employees who monitor internet forums and other places where consumers discuss dissatisfaction. GM monitored forums about the Z06 and knew from product launch about the overheating issue, and it was aware of the issue as shown below.

53. On or about February 22, 2015, Tadge Juechter (Corvette's Chief Engineer) stated the following, acknowledging GM's awareness of the overheating problem in the Z06s:

> The Z06 Automatic transmission put in "Drive" selects the lowest possible gear ratio for best acceleration, and because it has 8 closely-spaced ratios typically runs higher average RPM than the manual. This optimizes lap time performance, but also taxes the engine oil and coolant more for any given track. So the automatic has the capability to run faster laps than the manual, but thermal limitations are reached more quickly. Customers who are planning to run extended track-day sessions at 'professional' speeds, are advised to go with the manual transmission, or to paddle shift the automatic and select higher gears when conditions warrant it.
>
> Any time the maximum recommended temperatures are reached in any condition, the DIC will give warnings at the appropriate time for coolant, oil, or transmission fluid. A cool-down lap or two will bring operating temperatures back to a reasonable level and aggressive track driving can be resumed.
>
> Some may wonder why don't we design to higher temperatures, say 110 degrees, to accommodate southern tracks in the Summer.

We have used the "pro driver at 86 degrees" criteria for generations of Corvettes and for the vast majority of customers, it has resulted in excellent performance for their usage. If we designed to higher temperature criteria, we would have to add a lot of cooling hardware which drives mass up and perhaps more importantly, you have to feed the system with more air which has a huge impact on appearance and aerodynamic drag. Like most aspects of car design, the challenge is in finding the best balance of conflicting requirements.

54. One forum GM closely monitored was "StingrayForums.com." The following is one example of a complaint that GM was aware of, which was posted in May 2014:



55. The following is another complaint, posted in 2015 on a forum that GM monitored, commenting on "many" reports of overheating:



**Question:**
Does GM have any plan to sell a cooling pack in the future for the C7 chassis? Is it even a possibility, and if so, what would it look like?

Background
The limitations of the radiator and related parts that help the car stabilize oil and water/coolant temperature are easily reached when the C7 Z06 is driven aggressively (such as on a track at an HPDE event). There are now many reports from owners overheating the cars in 80 degree weather or even in 70 degree weather. This limitation of the car as sold will be exacerbated in the coming summer months. Many media outlets have reported overheating. This includes every occurrence when Motor Trend tested the C7 Z06 and during daily driving the C7 Stingray by Edmunds. See here:
http://www.edmunds.com/chevrolet/cor...tain-road.html

The commonly displayed overheating message is "Engine Overheating, A/C has been turned off, please idle engine." Coolant temperatures in particular approach quickly 257 degrees which prompt the computer to issue a warning in the center display.

Other manufacturers offer such an optional package to effectively cool the car. See for example the new Shelby GT350 Track Pack is described as follows: "optional with the Track Pack, an engine oil cooler and a transmission cooler."

https://media.ford.com/content/fordm...0-mustang.html

56. The following is another forum post on StingrayForums.com:



57. In the summer of 2015, GM was aware of the overheating issue and issued a

forum post telling Z06 owners that the car was built to race in temperatures up to 86°F and that a

higher temperature "affects all cars['] abilities to run sustained laps." The following is a post on

Stingrayforums.com where a consumer states in response:





58.     The following is a May 22, 2015 forum post regarding overheating in the Z06:



59.     The following is a forum post concerning "the mammoth overheating problem":

*13 THOUGHTS ON "2015 CHEVY CORVETTE Z06: OVERHEATING ISSUE. IS IT THE 8-SPEED TRANSMISSION'S FAULT?"*

**Art Woosley**    September 30, 2015 at 7:47 pm
The overheat issue and worse is squarely sitting on the narrow shoulders of Chevrolet. The know only to well that the Z06 engine was a bomb waiting to explode and suffers mammoth overheating problem. Was the problem addressed before the car was released? Hell NO! Chevrolet decided to disregard and disrespect the valued customer and instead worship the dollar. I am FINISHED with Chevy and am finished with the GM vendetta on consumers.
GM = GREAT MISTAKE

60.     The following is a post suggesting that the problem deserves a class action:

**Robert Kennedy**    June 1, 2016 at 4:54 pm
I recently bought a 2016 Corvette Z06 C7.R Edition. 1st open track day, 1st run, 12 minutes in, oil temp goes to 320 deg. and alarms go off on the dash. I immediately slow down and the alarms stop and oil temp comes down slowly but my track day is done and any other future track days. I'm very disappointed with this vehicle given how GM is advertising the vehicle. I'm now exploring aftermarket options to correct this problem. My understanding is there are other owners of this vehicle experiencing the same problem therefore we should come together and start a class action lawsuit against GM.

61.     GM was aware of the continuous series of complaints, like those above, that continued to be posted on various online forums.

**G.     Despite its express warranty, GM has not fixed the problems with the "track-proven" powertrain system.**

62.     In connection with the sale (by purchase or lease) of its new Z06s, GM provides an express limited warranty on each Z06. In the warranty, GM promises to repair any defect or malfunction that arises in the Z06 during a defined period of time. This warranty is provided by GM to Z06 owners in writing and regardless of what state the Z06 was purchased in.

63.     Each plaintiff was provided a warranty and it was the basis of the purchase of their Z06s.

- 27 -

64.     In the GM Warranty and in advertisements, brochures, press kits, and other statements in the media, GM expressly warranted that it would repair "any vehicle defect" that becomes apparent during the warranty period. The following uniform language appears in all Chevrolet Warranty Guides:[1]

> GM will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions, and limitations.
>
> **What is Covered**
>
> **Warranty Applies**
>
> This warranty is for GM vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> **Repairs Covered**
>
> The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.
>
> **No Charge**
>
> Warranty repairs, including towing, parts, and labor, will be made at no charge.

65.     With regard to the Corvette Z06, the duration of the limited warranty for bumper-to-bumper protection is three years or 36,000 miles, whichever occurs first. The powertrain warranty is five years or 56,000 miles, whichever occurs first. The "warranty period . . . begins on the date the vehicle is first delivered or put in use."[2] These terms were identical for all Z06s.

---

[1] *2016 Chevrolet Limited Warranty and Owner Assistance Information*, available at https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2016/Chevrolet/Multi-Model%20PDFs/2k16chevylimitedwty3rdPrint.pdf, at p. 4.

[2] *Id.*

- 28 -

66.     Plaintiffs and Class members all experienced defects in their powertrain systems within the warranty period. However, despite the existence of the express warranties provided to Plaintiffs and Class members, GM has failed to honor the terms of the warranties by failing to, "at no charge," repair to correct the defect.[3]

67.     Thus, it is impossible for owners to seek relief, even at their own expense, and still maintain the validity of their express warranty.

## VI.     CLASS ALLEGATIONS

68.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities who purchased or leased a 2015-2017 Chevrolet Corvette Z06 in or from the State of Illinois (the "Class").

69.     Excluded from the Class are individuals who have personal injury claims resulting from the operation of a Z06. Also excluded from the Class are General Motors LLC and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

70.     Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

---

[3] *Id.*

72.     <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are substantially more than 100 Class members, the precise number of Class members is unknown to Plaintiffs but may be ascertained from GM's books and records. At present, Plaintiffs allege nationwide sales of 8,653 2015 Z06s, 14,275 2016 Z06s, and over 10,000 2017 Z06s. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, Internet postings, and/or published notice.

73.     <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)      Whether GM engaged in the conduct alleged herein;

b)      Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed Z06s into the stream of commerce in the United States;

c)      Whether the Z06 contains defects;

d)      Whether such defects cause the Z06 to malfunction;

e)      Whether GM knew about the defects and, if so, how long GM has known of the defects;

f)      Whether GM designed, manufactured, marketed, and distributed Z06s with a defective "track-proven" powertrain system;

g)      Whether GM's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h)      Whether GM knew or should have known that the defects existed with regard to the Z06;

i)      Whether GM knew or reasonably should have known of the defects in the Z06 before it sold or leased them to Class members;

j)      Whether Plaintiffs and the other Class members overpaid for their Z06s as a result of the defects alleged herein;

k)      Whether Plaintiffs and the other Class members are entitled to equitable relief; and

l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

74.     <u>Typicality</u>: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through GM's wrongful conduct as described above.

75.     <u>Adequacy</u>: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Class; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

76.     <u>Declaratory and Injunctive Relief</u>: Federal Rule of Civil Procedure 23(b)(2): GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

77.     <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for Class members to individually seek redress for GM's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court

system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301 *ET SEQ.*)

78.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

79.     Plaintiffs bring this claim on behalf of themselves and the Class.

80.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

81.     GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

82.     The Z06 is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

83.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

84.     GM's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

85.     GM breached these warranties as described in more detail above. Without limitation, the Z06 is equipped with a defective "track-proven" powertrain system. The Z06s share a common design defect in that the system fails to operate as represented by GM.

86.     Plaintiffs and the other Class members have had sufficient direct dealings with either GM or its agents to establish privity of contract between GM on one hand and Plaintiffs and each of the other Class members on the other hand. GM-authorized dealerships and technical support organizations operating under contract to GM are agents of GM. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers. The dealers were not intended to be the ultimate consumers of the Z06s and have no rights under the warranty agreements provided with the Z06s; the warranty agreements were designed for and intended to benefit the consumers only.

87.     Giving GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so and GM has failed, after numerous attempts, to cure the defects. As explained above, any solution offered by GM must be exclusively paid for by Plaintiffs and Class members, which is a violation of GM's promise to repair and replace without charge. All solutions offered by GM are also aftermarket alterations and therefore undertaking these repairs may represent a new violation of the express warranties on the part of Plaintiffs and Class members. At the time of sale or lease of each Z06, GM knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the Z06's inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or give GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

88.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Z06s but did not receive the return of all payments made by them. Because GM is

- 33 -

refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Z06s by retaining them.

89.     Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of the Z06s and/or loss of the benefit of the bargain, in an amount to be proven at trial.

## COUNT TWO

## FRAUDULENT CONCEALMENT

90.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

91.     Plaintiffs bring this claim on behalf of themselves and the Class.

92.     GM intentionally concealed the defects contained in the "track-proven" powertrain systems that render Z06s unfit for track use, in that the transmissions of these Z06s would overheat when placed under track conditions and unexpectedly go into Limp Mode after approximately fifteen minutes, creating a dangerous hazard not only to the Z06 drivers but also to nearby racing vehicles. GM concealed the fact that the only way for Z06s to become "track-proven" as advertised is for GM owners to buy rear differential and transmission coolers at their own expense and potentially in violation of their express warranties.

93.     GM further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Z06s had no significant defects and were "track-proven."

94.     GM knew about the defects in the "track-proven" powertrain system when these representations were made.

95.     The Z06s purchased by Plaintiffs and the other Class members contained a defective "track-proven" powertrain system.

96. GM had a duty to disclose that the "track-proven" powertrain system contained defects as alleged herein and that these defects created a safety hazard. Plaintiffs and the other Class members relied on GM's material representations.

97. As alleged herein, at all relevant times, GM has held out the Z06s to be free from defects such as the defects related to the "track-proven" powertrain system. GM touted and continues to tout the many benefits and advantages of the "track-proven" powertrain system, but nonetheless failed to disclose important facts related to the defects and that the Class members would be required to make additional aftermarket modifications to adequately achieve "track-proven" performance, and that these modifications may violate their express warranties. This made GM's other disclosures about the "track-proven" powertrain system deceptive.

98. The truth about the defective "track-proven" powertrain system was known only to GM; Plaintiffs and the other Class members did not know of these facts and GM actively concealed these facts from Plaintiffs and the other Class members.

99. Plaintiffs and the other Class members reasonably relied upon GM's deception. They had no way of knowing that GM's representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Class members did not, and could not, unravel GM's deception on their own. Rather, GM intended to deceive Plaintiffs and the other Class members by concealing the true facts about the Z06's "track-proven" powertrain systems.

100. GM's false representations and omissions and/or misrepresentations were material to consumers because they concerned qualities of the Z06s that played a significant role in the value of the Z06s and forced Class members to make additional expenditures to ensure proper safety at the race track.

101.    GM had a duty to disclose the defects inherent in the "track-proven" powertrain system and violations with respect to the Z06s because details of the true facts were known and/or accessible only to GM, because GM had exclusive and/or superior knowledge as to such facts, and because GM knew these facts were not known to or reasonably discoverable by Plaintiffs or Class members.

102.    GM also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with the Z06s, without telling consumers that the defective "track-proven" powertrain system would affect the safety, quality, and performance of the Z06.

103.    GM's disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defects in the "track-proven" powertrain system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Z06s purchased by Plaintiffs and the other Class members.

104.    GM has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Class members by concealing material information regarding the defects in the "track-proven" powertrain system.

105.    Plaintiffs and the other Class members were unaware of the omitted material facts referenced herein and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty powertrain systems and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Class members' actions were justified. GM was in exclusive and/or superior control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

106.    Because of the concealment and/or suppression of facts, Plaintiffs and the other

Class members sustained damages because they lost the benefit of the bargain and own(ed) Z06s

that are diminished in value as a result of GM's concealment of the true quality of the Z06's

"track-proven" powertrain systems. Had Plaintiffs and the other Class members been aware of

the defects in the "track-proven" powertrain systems installed in the Z06s, and the company's

disregard for the truth, Plaintiffs and the other Class members who purchased a Z06 would have

paid less for their Z06s or would not have purchased them at all.

107.    Plaintiffs have been deprived of the benefit of their bargain and the value of

Plaintiffs' and the other Class members' Z06s has diminished as a result of GM's fraudulent

concealment of the defective "track-proven" powertrain system of the Z06s, which has made any

reasonable consumer reluctant to purchase any of the Z06s, let alone pay what otherwise would

have been fair market value for the Z06s.

108.    Accordingly, GM is liable to Plaintiffs and the other Class members for damages

in an amount to be proven at trial.

109.    GM's acts were done wantonly, maliciously, oppressively, deliberately, with

intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights and

the representations that GM made to them, in order to enrich GM. GM's conduct warrants an

assessment of punitive damages in an amount sufficient to deter such conduct in the future,

which amount is to be determined according to proof.

## COUNT THREE

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD
### AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILCS 505/1 *ET SEQ.* AND 720 ILCS 295/1A)

110.    Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this complaint.

111.    Plaintiffs bring this claim on behalf of themselves and the Class.

112.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 ILCS 505/2.

113.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

114.    Plaintiffs and Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

115.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against Defendant in the amount of actual damages as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

116.    Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS 505/1 *et seq*.

### COUNT FOUR

### UNJUST ENRICHMENT

117.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

118.    Plaintiffs bring this claim on behalf of themselves and the Class.

119.    GM has benefitted and been enriched by the conduct alleged herein. GM has generated substantial revenue from the unlawful conduct described herein. GM has knowledge

and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Class members.

120.    GM has voluntarily accepted and retained this benefit.

121.    The circumstances, as described herein, are such that it would be inequitable for GM to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Class members.

122.    Plaintiffs and the other Class members are entitled to the amount of GM's ill-gotten gains, including interest, resulting from its unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against General Motors, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.    An order temporarily and permanently enjoining General Motors from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program;

D.    Injunctive relief in the form of a buy back;

E.    Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

F.    An order requiring General Motors to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: October 30, 2017                         Respectfully Submitted,

                                                By: */s/ Steve W. Berman*
                                                Steve W. Berman
                                                Shelby Smith (*pro hac vice forthcoming*)
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                1918 Eighth Avenue, Suite 3300
                                                Seattle, WA 98101
                                                Telephone: (206) 623-7292
                                                Facsimile: (206) 623-0594
                                                Email: steve@hbsslaw.com
                                                Email: shelbys@hbsslaw.com

                                                Elizabeth A. Fegan
                                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                                455 N. Cityfront Plaza Drive, Suite 2410
                                                Chicago, IL 60611
                                                Telephone: (708) 628-4960
                                                Facsimile: (708) 628-4950

                                                Stuart Z. Grossman
                                                Rachel Furst
                                                GROSSMAN ROTH YAFFA COHEN
                                                2525 Ponce de Leon, Suite 1150
                                                Coral Gables, FL 33134
                                                Telephone: (888) 296-1681
                                                Facsimile: (305) 285-1668
                                                Email: szg@grossmanroth.com
                                                Email: rwf@grossmanroth.com

                                                Jason D. Weisser
                                                SCHULER, HALVORSEN, WEISSER, ZOLLER &
                                                OVERBECK
                                                1615 Forum Place, Suite 4
                                                West Palm Beach, FL 33401
                                                Telephone: (561) 689-9180
                                                Facsimile: (561) 684-9683
                                                Email: jweisser@shw-law.com

                                                *Attorneys for Plaintiffs and the Proposed Class*